**RADIO HANOVER, INC., a Corporation, Plaintiff,**

**v.**

**UNITED UTILITIES, INC., a Corporation, the United Telephone Company of Pennsylvania, a Corporation, United Transmission, Inc., a Corporation, Susquehanna Broadcasting Co., a Corporation, Penn-Mar Publishing Company, a Corporation, the Brush-Moore Newspapers, Inc., a Corporation, and Penn-Mar CATV, Inc., a Corporation, Defendants .**

**Civ. No. 9875.**

United States District Court
M. D. Pennsylvania.
March 24, 1967.

**710**

Lewis A. Rivlin, Ardon B. Judd, Jr., O'Connor, Green, Thomas, Walters & Kelly, Washington, D. C., Arthur Berman, Berman & Boswell, Harrisburg, Pa., for plaintiff.

Warren E. Baker, Washington, D. C., John C. Kelley, Metzger, Hafer, Keefer, Thomas & Wood, Harrisburg, Pa., for defendants United Utilities, United Telephone, and United Transmission.

Edwin M. Buchen, Hanover, Pa., for defendants Penn-Mar Pub. Co., Penn-Mar CATV, Inc., and Brush-Moore Newspapers, Inc.

G. Taylor Hess, York, Pa., for defendant Susquehanna Broadcasting Co.

## MEMORANDUM

NEALON, District Judge.

Plaintiff, Radio Hanover, Inc. (Radio Hanover), a Pennsylvania corporation, brought this suit against defendants, charging them with conspiring to monopolize, and with monopolizing community antenna television and broad-band coaxial cable services in the area of Hanover, Pennsylvania, in violation of the Act of July 2, 1890, commonly known as the Sherman Act, 15 U.S.C. § 1 and § 2. A temporary restraining order was issued on March 2, 1967, and on March 15 and 16, 1967, a hearing was held on plaintiff's motion for a preliminary injunction filed pursuant to Rule 65 of the Federal Rules of Civil Procedure.

From the evidence adduced at the hearing, I make the following findings of fact:

Plaintiff is engaged in the business of radio broadcasting in the Hanover area. Defendant, United Utilities, Incorporated (United Utilities), is a holding company which owns various companies, including defendant, United Telephone Company (United Telephone), and defendant, United Transmission, Inc. (United Transmission). Defendant, United Telephone is a Pennsylvania corporation and is an operating telephone company authorized to provide communication services in a number of exchange areas in Pennsylvania, including the community of Hanover. Defendant, United Transmission, is a Kansas corporation engaged in the business of building and operating Community Antenna Television systems (CATV). Defendant, Susquehanna Broadcasting Company (Susquehanna), is a Delaware corporation engaged in the business of owning and operating radio and television stations, including television station WSBA-TV in York, Pennsylvania. Defendant, Brush-Moore Newspapers, Inc. (Brush-Moore), is an Ohio corporation, and owns and controls a number of newspapers, including *The Evening Sun* of Hanover, of which it is a principal owner. Defendant, Penn-Mar Publishing Company (Publishing Company), is a Pennsylvania corporation and is the publisher and part owner of *The Evening Sun.* Defendant, Penn-Mar CATV, Inc. (Penn-Mar), is a Pennsylvania corporation created to provide CATV service in the Hanover area and it is equally owned by United Transmission, Susquehanna and the Publishing Company.

During the year 1965, Radio Hanover, United Transmission, Susquehanna and *The Evening Sun* expressed interest in obtaining a Community Antenna Television (CATV) franchise from the Borough Council of Hanover. Formal ap-

plications were filed with the Borough Council by Radio Hanover, United Transmission, Susquehanna and *The Evening Sun* prior to January 1, 1966. On May 28, 1966, the applicants were invited by the Borough Manager to attend a Council meeting on June 8, 1966, at which time the subject of CATV was to be discussed. At the meeting of June 8, Paul F. Worcester, President of Hanover Borough Council, suggested that all the applicants join together and form one company for the purpose of acquiring a franchise. After considering this suggestion, Radio Hanover rejected it, but United Transmission, Susquehanna and *The Evening Sun* joined together and formed Penn-Mar CATV, Inc., which was formally incorporated on August 19, 1966. In the meantime, Radio Hanover had informed United Telephone that it was interested in leasing space on United Telephone's poles [1] for the purpose of constructing Radio Hanover's cable system thereon if successful in obtaining a franchise. On August 30, 1966, United Telephone notified Radio Hanover that it would not enter into agreements with CATV companies for the leasing of attachment space on the poles for lessee's cable equipment, but that it would construct the necessary cable facilities and then lease them to the respective companies. On October 19, 1966, the Hanover Borough Council, by Ordinance No. 1331, granted franchises to both Radio Hanover and Penn-Mar and extended to them " * * * the right and privilege to construct, erect, operate and maintain, in, upon, along, across, above, over and under the streets, alleys, public ways and public places * * * in the Borough, wires, cables, underground conduits, manholes and other television conductors and fixtures necessary for the maintenance and operation in the Borough of a CATV system * * *." The Borough Council specified that "no poles shall be erected within the Borough by the companies without the express au-

thorization of Council. The Companies shall arrange to use the poles of the public Utilities Companies for the distribution of said video and/or audio signals * * *." On December 13, 1966, Radio Hanover executed a CATV pole attachment agreement with the electric utility, Metropolitan Edison Company, in which Radio Hanover was authorized to attach its television cable system to poles of Metropolitan Edison at a rental of $4.50 per pole per year. United Telephone, however, persisted in its refusal to allow Radio Hanover to attach its cable system to United Telephone's poles, but, at the same time, reiterated that it would construct the necessary cable facilities and lease these facilities to Radio Hanover. This latter proposal was unacceptable to Radio Hanover and this lawsuit resulted. Defendants' evidence revealed that Penn-Mar received $30,000.00 from the sale of its stock and approximately $10,000.00 has been expended and approximately $36,000.00 committed for future expenses. Rounding out the factual picture, defendants stipulated that they were capable of constructing their own CATV system in Hanover on a highly expedited basis.

The evidence establishes that there is a tremendous economic future for owners of broad-band coaxial cable, of which CATV is only a small part. The expert testimony at the hearing was to the effect that the same strand of coaxial cable can handle innumerable simultaneous signals as long as they are at separated and non-interfering frequencies and volumes. Plaintiff's expert testified that the cable spectrum extends to a measurement of 1000 megahertz (MHz) and there is room on the cable for some 130 TV channels above Channel 13, up to 1000 MHz; enough room for 14 channels between standard channels 6 and 7 (88 to 174 MHz), and enough channels below Channel 2 (54 MHz) for 9 additional TV channels. According to this witness, a TV channel needs about 6

---

[1]. There are approximately 1137 poles owned by United Telephone in Hanover Borough and 1317 poles owned by the electric utility, Metropolitan Edison Company.

MHz of band width and only 72 MHz, or 7.2% of the spectrum up to 1000 MHz is commonly used for television. Moreover, FM music needs only 0.2 MHz, facsimile newspapers and photographs 0.05 MHz, voice signals and data transmission signals only 0.004 MHz. The services technically possible over cable are facsimile newspapers and other periodicals; fire and burglar alarm systems; data processing; computerized library retrieval; central bookkeeping, record keeping and inventory control; traffic monitoring and control, and direct merchandising, whereby a housewife may, while at home, view products on display in a store and place her order through cable facilities. There is no doubt that the potential market for broad-band coaxial cable is prodigious and the accompanying economic benefits are obvious. Plaintiff sets forth in its brief, "The true significance of the future uses of broad-band coaxial cable in this case is that the reality of that future motivates United Utilities and explains why United created United Transmission, and also explains why it now refuses, insofar as it can, to permit ownership of coaxial cable in communities where its subsidiaries control the poles." In short, plaintiff contends that the owner of broad-band coaxial cable facilities will also control the future services which will be available through such facilities. According to plaintiff, this control is solidified further in this case by the fact that the ordinance requires the franchisees to use the poles of the Public Utility Companies for the distribution of radio and audio signals and no new poles can be erected without the express authorization of Council.

Defendants, on the other hand, deny any attempt to monopolize CATV in Hanover and charge that it is plaintiff who seeks the monopoly, contending that after plaintiff was denied its application for an exclusive franchise by Hanover Borough Council, it commenced this action in which it seeks, inter alia, the dissolution of its only competitor, Penn-Mar CATV, Inc. Moreover, defendants allege that as early as July 22, 1965, more than one year before CATV franchises were granted in Hanover, United Telephone, by public release, stated that no new pole attachment contracts would be considered except in exceptional cases and that United Telephone would lease its cable facilities to any applicant applying for service. United Telephone asserts that it stands ready to offer the same lease-back arrangement to plaintiff as it did to Penn-Mar, but that plaintiff " * * * seeks no deal except on its terms." Also, United Telephone declares that workmen of another company may damage telephone facilities in the process of doing their work and that additional cables get in the way and require the making of changes on the poles, as well as increasing the number of records to be kept. Defendants sum up their arguments, as follows:

"The mere fact that a telephone company which is publicly regulated does not relinquish its exclusive control of the use of its poles to others, does not mean that it seeks to exclude others from competing in CATV services. This fundamental fact is evidenced by plaintiff's own admission that United of Pennsylvania will permit the use by plaintiff of its distributional cable facilities. This is fully in accord with its common carrier tariff provisions at the FCC. Plaintiff, however, wants to rent just the poles, and own the cables installed therein for its use. The refusal by United of Pennsylvania to agree to such a procedure cannot be equated with an attempt to exclude plaintiff from competing with Penn-Mar."

Plaintiff's motion for preliminary injunction seeks to enjoin defendants from constructing or operating any community antenna cable television system in or near the Borough of Hanover pending final determination on the merits of the complaint and " * * * that defendants promptly undertake all possible steps to minimize the damages which may flow from the imposition of this injunction, including, but not limited to: discharg-

ing employees; preserving, returning or selling all equipment and material heretofore acquired; cancelling all outstanding orders for equipment and material, and surrendering the leasehold, or arranging for the subleasing thereof, with regard to all premises acquired for defendant Penn-Mar CATV, Inc. * * * "

An application for an interlocutory injunction is addressed to the sound discretion of the Court and should be granted only upon a clear showing that irreparable injury would possibly result pendente lite if relief is denied. Industrial Electronics Corporation v. Cline, 330 F.2d 480 (3d Cir. 1964); Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26 (3d Cir. 1961). Preliminary injunctions should be viewed with caution and only granted in those clear cases where there is substantial probability of eventual success. Graham v. Triangle Publications, Inc., 233 F. Supp. 825 (E.D.Pa.1964), affirmed 344 F.2d 775 (3d Cir. 1965). In passing upon a motion for preliminary injunction, the Court should consider the balancing of the conveniences of the parties and possible injuries to them by the granting or withholding of the injunction. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569 (3d Cir. 1959).

With reference to the question of irreparable injury, defendants argue strenuously that injunctive relief is not necessary, inasmuch as the cables of plaintiff could be expeditiously added to the poles at any time, if so ordered by the Court, and damages could be easily calculated by examining Penn-Mar's subscription lists since the institution of this lawsuit. Defendants complain that if a preliminary injunction is granted and plaintiff does not prevail after trial on the merits, then defendants will suffer a serious financial loss, i. e., amounts already invested and potential revenue or profits, which the limited resources of plaintiff could not compensate. In addition, defendants suggest " * * * if plaintiff is successful in securing the dissolution of Penn-Mar, plaintiff could, in effect, step into the shoes of Penn-Mar and have a fully operational system and business." Plaintiff resists this argument, maintaining that:

"The intervening period, while defendants were providing the service and plaintiff was not, would still result in substantial injury to Radio Hanover in a number of ways, each of them difficult to assess but each of them substantially irreparable. Primary among them would be that plaintiff could not begin developing public spirited locally oriented CATV in the way plaintiff planned to develop it but for defendants' refusal to let plaintiff attach to the poles. * * * Finally, in the intervening period until the ruling on the merits, Radio Hanover would be foreclosed from developing and expanding the system in the way Radio Hanover would like to into adjoining communities within the WHVR listening area."

The basis of plaintiff's lawsuit is that defendants, acting in concert, violated the Anti-Trust provisions of the Sherman Act. If this is established on the merits, then the Court would be justified in utilizing all its power to fashion appropriate relief. The irreparable harm hereinabove quoted from plaintiff's brief is not persuasive. The limitation on developing locally oriented CATV and on expanding the system into adjoining communities does not constitute irreparable harm. Ultimate injunctive relief and monetary damages would afford adequate redress for plaintiff. As was noted by the Court of Appeals for the District of Columbia in Virginia Petroleum Job Ass'n v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

Moreover, the record thus far casts some doubt on the substantial probability of plaintiff's eventual success. As was stated by former Chief Judge Biggs in Madison Square Garden Corp. v. Braddock, 90 F.2d 924 (3d Cir. 1937), "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." This much is clear, defendant, United Telephone, has offered the same leasing arrangement to plaintiff as it has to Penn-Mar. Plaintiff, however, contends that it is entitled to place its own cable equipment on pole space rented from United Telephone, especially in light of defendants' alleged conspiracy to monopolize the broad-band coaxial cable market in the Hanover area. The evidence linking Susquehanna, Brush-Moore and Publishing Company to such a scheme is not compelling at this stage of the proceedings. There is evidence of United Utilities' interest in the future development of coaxial cable facilities and the personal benefit to be derived therefrom, but the expression of interest appears to be as compatible with legitimate participation in the field as it is with a desire to monopolize and control it. These observations and findings are sufficient for the purpose of this motion as I do not want to prejudge those critical issues which must await final hearing. By expressing doubt, I do not mean to indicate any opinion on the merits of the case except through the eyes of one weighing "substantial probability of success" as a prerequisite to ordering the extraordinary remedy of preliminary injunctive relief.

Finally, in disposing of all the points raised at this time, I conclude that the possible injuries to defendants would not require withholding the issuance of a preliminary injunction if irreparable injury and substantial probability of eventual success had been satisfactorily established. However, my findings relative to these factors eliminate its importance in the disposition of the present motion.

Accordingly, I make the following

### Conclusions of Law

1. This Court has jurisdiction over the subject matter of the suit and the parties.

2. Plaintiff has not carried its burden of showing that irreparable injury will result to plaintiff if a preliminary injunction is not granted.

3. Plaintiff has not carried its burden of showing a reasonable probability of success on final hearing.

4. Plaintiff's evidence does not establish a right to interlocutory injunctive relief.

### ORDER

Now, March 24, 1967, in accordance with the Memorandum this day filed, it is Ordered that plaintiff's motion for a preliminary injunction is denied.